UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Roberto Lee (01) and<br>Donald Jeffrey Goodwin (06),<br><br>Defendants. | Case No. 19-cr-0168 (MJD/HB)<br><br>**REPORT AND RECOMMENDATION** |

HILDY BOWBEER, United States Magistrate Judge

This case is before the undersigned United States Magistrate Judge on Defendant Roberto Lee's Motion to Suppress Wiretap Intercepts [Doc. No. 95] and Defendant Donald Jeffrey Goodwin, Jr.'s Motion for Disclosure of Wiretaps, Oral Communications, or Other Eavesdropping [Doc. No. 133].[1] The case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.

---

[1] Goodwin included a request for suppression as part of his motion for disclosure of electronic and wiretap surveillance evidence. (*See* Goodwin's Mot. Disclosure at 1 [Doc. No. 133].) Section II.F.1.a. of the Electronic Case Filing Procedures Guide for Criminal Cases requires that such motions be filed separately. At the hearing on the motion, Goodwin's attorney stated that the disclosure aspect of the motion was moot but that Goodwin was still seeking to suppress the evidence seized as a result of the wiretap. The Court will therefore consider the motion for disclosure also as a dispositive motion for suppression of evidence, but reminds Goodwin's attorney that he may not combine a motion for disclosure and a motion for suppression in the same filing in the future.

## I. Introduction

Lee and Goodwin seek to suppress evidence seized as a result of a wiretap authorized by the Honorable Donovan W. Frank, United States District Judge, on January 25, 2019.[2] They argue that the Government did not demonstrate necessity in the Application for the wiretap, as required by 18 U.S.C. § 2518(1)(c).

## II. The Necessity Requirement of 18 U.S.C. § 2518(1)(c)

An application for the interception of a wire, oral, or electronic communication under 18 U.S.C. § 2518 must include, *inter alia*, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The statute requires "that normal investigative procedures be used first," but "it does not require that law enforcement officers exhaust all possible techniques before applying for a wiretap." *United States v. Macklin*, 902 F.2d 1320, 1326 (8th Cir. 1990). The government is not limited to seeking a wiretap only "only as a last resort." *Id.* at 1327. When conspiracy is one of the offenses under investigation, the necessity requirement is met when investigators "establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the

---

[2] The Order Authorizing the Interception of Wire and Electronic Communications ("Order") was included in Government Exhibit 2, which was submitted at the pretrial motion hearing on August 21, 2019. Government Exhibit 2 also includes, *inter alia*, the Application for the Interception of Wire and Electronic Communications ("Application") and the Affidavit in Support of Application for the Interception of Wire and Electronic Communications ("Affidavit"). The Court will cite to the specific documents in the omnibus exhibit by document name, paragraph, and Bates-stamped page number.

identity of each coconspirator." *United States v. Jackson*, 345 F.3d 638, 644 (8th Cir. 2003).

A judge presented with an application for a wiretap must determine whether the statutory requirement is met "in a commonsense manner, and the determination is a finding of fact, which can be reversed only if clearly erroneous." *Macklin*, 902 F.2d at 1327. "[C]onsiderable discretion rests with the judge to whom the wiretap application is made." *United States v. Daly*, 535 F.2d 434, 438 (8th Cir. 1976).

### III. The Affidavit Submitted in Support of the Wiretap

The Application for the wiretap sought an order authorizing the interception of wire and electronic communications related to a Verizon cellular telephone ("TT1") allegedly used by Roberto Lee ("Lee"). (Aff. ¶ 4.a., at 2228.) The Affidavit submitted in support of the Application set forth the following relevant information.

The Drug Enforcement Administration ("DEA") began investigating Lee for cocaine and methamphetamine trafficking in June 2017. (Aff. ¶ 5, at 2228.) In July 2017, investigators spoke with a confidential source, "CS1," who provided information about a drug trafficking organization ("DTO") and a suspected drug trafficker named Raymond Portz ("Portz"). (Aff. ¶ 21, at 2233–34.) CS1 said that Portz's "Dad" distributed large amounts of cocaine, methamphetamine, and heroin, and investigators identified Portz's "Dad" as Lee. (Aff. ¶ 22, at 2234.) In October 2017, investigators facilitated a controlled purchase of methamphetamine from Portz by CS1. (Aff. ¶ 22, at 2234.)

In January 2018, investigators facilitated a controlled purchase of cocaine from

3

Lee using another confidential source, "CS2." (Aff. ¶ 5, at 2228–29.) CS2 also provided information about alleged drug trafficking activities by Lee and Portz. (Aff. ¶ 23, at 2234.) As the investigation continued, officers seized 50 pounds of methamphetamine shipped from a suspected member of the DTO in March 2018, and 46 pounds of methamphetamine in August 2018. (Aff. ¶ 5, at 2229.)

In January 2019, investigators in Minnesota obtained from DEA agents in Texas a recorded telephone call between Lee and Roberto Tyrone Williams ("Williams") concerning a suspected shipment of drugs from Lee to Williams. (Aff. ¶ 6, at 2229; Aff. ¶¶ 27–34, at 2235–38.) Later that month, investigators seized approximately two kilograms linked to Williams. (Aff. ¶ 6, at 2229.) DEA agents in Texas also provided a text message between Williams and Lee, using TT1, sent an hour after the recorded telephone call. (Aff. ¶ 7, at 2229; Aff. ¶ 35, at 2238.)

A few days later, investigators in Minnesota obtained a search warrant for GPS locator data for TT1. (Aff. ¶ 37, at 2238–39.) Investigators also surveilled Lee at his home, in his car, and at other locations. (Aff. ¶¶ 38–42, at 2239–40.)

Investigators met with a third confidential source, "CS6," in mid-January 2019 to arrange a controlled purchase of cocaine from Daniel Bonorden, another individual suspected of involvement in the DTO. (Aff. ¶ 43, at 2240.) CS6 told investigators they could find a "bigger dealer"—"Ray's dad"—if given enough time. (Aff. ¶ 43, at 2240.) About that same time, DEA agents in Texas provided another recorded telephone call between Williams and Lee, using TT1, about a suspected shipment of drugs. (Aff. ¶¶ 44–47 , at 2241–42.)

4

Based on the above information and other information obtained during the investigation, law investigators believed Lee, Portz, and other DTO members were trafficking large amounts of cocaine and methamphetamine in Minnesota. (Aff. ¶ 48, at 2242.) They further believed Lee was using TT1 to communicate about drug trafficking, and that wire and electronic interception of TT1 would identify additional co-conspirators and sources of supply. (Aff. ¶ 48, at 2242–43.)

The Affidavit included a toll analysis of a pen register device installed on TT1 for 60 days, which revealed that TT1 had contact with telephones utilized by persons of interest in the investigation. (Aff. ¶ 49, at 2243.) TTI was used for telephone calls and text messages to and from Williams; Eliseo Davila, whom investigators also believed was involved in the DTO; and Bonorden. (Aff. ¶¶ 50–58, at 2243–48.)

The Affidavit also described in detail the need for electronic interception and the limited success of other investigative techniques. Controlled purchases and physical surveillance led to the recovery of drugs and identified some, but not all, of Lee's associates. (Aff. ¶ 59, at 2248.) With particular respect to the confidential sources, their information had proven useful, but was not sufficient to further advance the investigation. (Aff. ¶ 61, at 2251.) CS1 and CS2 were no longer active confidential sources, and CS6 was not a member of the DTO. (Aff. ¶ 62, at 2251.) The affiant believed there was "no way in which these confidential sources [could] further infiltrate the Lee DTO." (Aff. ¶ 62, at 2251.) Nor would an undercover law enforcement officer be able to infiltrate the DTO. (Aff. ¶ 69, at 2254.)

Investigators believed that additional physical surveillance would not identify

5

additional co-conspirators or establish the roles of known conspirators. (Aff. ¶ 70, at 2255.) According to the Affidavit, the nature of physical surveillance simply would not provide the depth of information needed to identify the members of the DTO, understand the structure of the DTO, identify storage locations, and reveal sources of supply. (Aff. ¶¶ 79–81, at 2258–59.) In addition, Lee and other subjects of the investigation had been observed using counter-surveillance techniques to frustrate physical surveillance. (Aff. ¶ 70–79, at 2255–58.)

Trash searches at Portz's residence and Lee's residence did not provide any information about the DTO. (Aff. ¶ 59, at 2248; Aff. ¶, 82, at 2259.) Investigators believed additional trash searches would not be effective in identifying the principal members of the DTO, how and when drugs were delivered to the DTO, or the location of the proceeds. (Aff. ¶ 84, at 2260.)

Telephone toll records from pen registers had been useful in identifying some subjects and communication facilities, but such records were limited to confirming contacts between telephones. (Aff. ¶ 91, at 2262.) The content of the conversations was unknown. (Aff. ¶ 92, at 2263.)

A pole camera installed at Lee's residence had provided some useful data, but not specific evidence of criminal activity. (Aff. ¶ 59, at 2248.) Although the camera showed individuals coming and going from the residence, footage did not reveal the purpose of meetings between Lee and his associates, the subject of their conversations, or any criminal activity that might have occurred in the residence. (Aff. ¶¶ 103–04, at 2267.)

The intercepted communications between Williams and Lee were also helpful to

investigators, but did not reveal the scope of the DTO, how and when drugs would be entering Minnesota, or the amount of drugs being transported. (Aff. ¶ 105, at 2268.) Investigators believed such information could be obtained, however, by intercepting communications to or from TT1. (Aff. ¶ 105, at 2268.)

Investigators believed that search warrants for Lee's and Portz's residences and businesses would not reveal the full scope of the conspiracy, the sources of supply, or the identity of other members of the DTO. (Aff. ¶ 93, at 2263.) The affiant explained that large-scale drug traffickers typically use multiple locations to store drugs and the proceeds of criminal activity. (Aff. ¶ 94, at 2263.) Given the scope of the conspiracy and number of suspected co-conspirators, investigators believed it would be very unlikely that they could uncover incriminating evidence at a single location. (Aff. ¶ 94, at 2264.) Moreover, considering the relatively brief turnaround time between the receipt and distribution of drugs, the chance of discovering pertinent evidence at a location at a certain time would be low. (Aff. ¶ 94, at 2264.)

## IV. Discussion

Lee and Goodwin contend that the Affidavit showed that the investigation was regularly uncovering information through intercepted telephone calls and text messages, the use of confidential sources and controlled purchases, and video surveillance. Thus, they argue, normal investigative procedures were succeeding, not failing. Though Defendants are correct that these investigative methods were somewhat successful, the Affidavit addresses the limitations of each method and explains why further use of each technique would likely not be successful. Specifically, the methods would not reveal

7

additional co-conspirators, identify additional members of the DTO, yield details about how drugs were being transported and stored, or expose sources of supply and customers.

Specifically with respect to the Texas wiretap, nothing in the intercepted communications described who would transport the drugs, the timing of the delivery, the quantity of drugs, where the delivery would occur, the amount Lee would receive, or how the money would be provided. Nor did the recorded calls reveal the scope of the DTO or additional co-conspirators. Moreover, at the time the investigators applied for the wiretap for TT1, Williams was no longer using the phone for which the Texas wiretap was obtained. (Aff. ¶ 105, at 2268.)

With specific regard to the pole camera, as the Affidavit explained, the camera captured images of individuals coming and going from the residence, but did not reveal the purpose of any meetings, the subject of conversations, or any criminal activity that might have occurred inside Lee's residence.

As to confidential sources, the Affidavit further explained why the use of the confidential sources was not sufficient to meet the goals of the investigation such as identifying the sources of drugs and the scope of the DTO. In addition, at the time of the Application for the wiretap, two of the sources were no longer active, and CS6 was not a member of the DTO. To that point, Goodwin argues that investigators should have allowed more time for CS6 to develop a closer relationship with Lee. While it is possible that CS6 could have advanced higher in the DTO over time, it was not certain whether or, if so, when that would happen. Regardless, investigators were not required to exhaust all possible methods before applying for a wiretap. *See United States v. Turner*, 781 F.3d

374, 383 (8th Cir. 2015) (quoting *Macklin*, 902 F.2d at 1326.)

Goodwin next argues that investigators should have conducted more physical surveillance and trash searches. Similar to the pole camera, however, physical surveillance was inherently limited. Additional surveillance was not likely to identify all co-conspirators, establish the roles of known conspirators, understand the structure of the DTO, identify storage locations, or reveal sources of supply. In addition, Lee and other subjects of the investigation were using counter-surveillance techniques. As for trash searches, the two trash searches that were conducted did not reveal any information about the DTO, and investigators believed additional searches would not be effective in identifying additional co-conspirators or principal members of the DTO, details such as how and when drugs would be delivered, or the location of the proceeds.

Goodwin also suggests that pen registers and toll records were not sufficiently utilized. But as the Affidavit explained, toll records were limited to confirming contacts between telephones and did not reveal the content of the conversations.

Finally, Goodwin questions why subject interviews were not utilized. The Affidavit explains that such interviews would be unlikely to reveal the identities of all co-conspirators, the sources of drugs and proceeds, and the locations of drugs and proceeds. (Aff. ¶ 97, at 2265.) Furthermore, suspects or targets would likely provide false information or refuse to provide information. (*Id.*) Such interviews could even compromise the investigation by alerting members of the conspiracy. (*Id.*)

In sum, the Court finds the Government satisfied the necessity requirement of § 2518(1)(c) in its Application for the wiretap. The Court therefore recommends that the

motions to suppress evidence seized pursuant to the wiretap be denied.

## V. Recommendation

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Roberto Lee's Motion to Suppress Wiretap Intercepts [Doc. No. 95] be **DENIED**; and

2. Defendant Donald Jeffrey Goodwin, Jr.'s Motion for Disclosure of Wiretaps, Oral Communications, or Other Eavesdropping [Doc. No. 133] be **DENIED AS MOOT** as to the request for disclosure of evidence, and **DENIED** as to the request for suppression of evidence.


Dated:  October 16, 2019          s/ *Hildy Bowbeer*
                                  HILDY BOWBEER
                                  United States Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.  Under D. Minn. LR 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in D. Minn. LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.