UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 19-168(1) (MJD/HB)

United States of America,

                Plaintiff,

vs.

Roberto Lee,

                Defendant.

**DEFENDANT'S POSITION WITH RESPECT TO SENTENCING AND REQUEST FOR VARIANCE**

This memorandum is submitted on behalf of Defendant Roberto Lee in connection with his sentencing before the Honorable Michael J. Davis. This sentencing memorandum will first address the remaining objections to the PSR and the guideline calculation for the offenses to which Mr. Lee pleaded guilty. Second, the memorandum will articulate and outline the basis for Mr. Lee's request for a downward variance from the advisory sentencing guideline range and why such a sentence is consistent with the provisions of 18 U.S.C. § 3553(a).

Unfortunately, Mr. Lee has been in this situation before. As referenced in the Indictment and the §851 enhancement, Mr. Lee has previously pled guilty to a controlled substance offense and served a lengthy prison term. No one knows better than he that he should have never placed himself in the position that he now stands before the Court. At first blush, one could easily say that there is no reason to have any empathy or mercy, because he should have known better. On the other hand, as his personal background and upbringing demonstrates, this was a life that he had known and that had tried to get out of, but he fell back into it when his attempt at legitimate business activity failed. While he

recognizes that is not an excuse, he wants the Court to know those facts, understand his upbringing, and take the full story of his life into account when determining an appropriate sentence.

The Presentence Report calculated a guideline range for imprisonment of 360 months to life, based on a total offense level of 40 and a criminal history category of IV. Mr. Lee objects to the role enhancement that he was a manager/supervisor of a criminal activity that involved five or more participants and objects to a 2-level increase based on the allegation that he involved a minor in the offense. Mr. Lee believes the proper advisory guideline range should be 292–365 months, based on an offense level of 37.

Mr. Lee is requesting a sentence less than the advisory guideline range and a variance based on 18 U.S.C. §3553 (a) factors and his own unique circumstances. There is no violence in his past or in this case. The guidelines recommend an arbitrary and unjust increase based on the purity of the methamphetamine, increasing his advisory sentencing range by more than five years. Mr. Lee maintains that a sentence of no greater than 180 months imprisonment is sufficient but not greater than necessary to accomplish the goals of sentencing.

## SPECIFIC OBJECTIONS TO THE PSR

Mr. Lee raised numerous objections to the preliminary PSR, and many of those objections were incorporated into the final draft. Mr. Lee maintains the following objections to the PSR:

**Offense Conduct**

¶21 Mr. Lee objects to the characterization and use of the term "Lee DTO," in this paragraph and throughout the PSR. Mr. Lee does acknowledge that he was involved in

2

the distribution of controlled substances but does not acknowledge that that there was a "Lee DTO." There were several individuals loosely aligned in the distribution and sale of controlled substances. Mr. Lee was primarily involved in the distribution of cocaine.

Mr. Lee also objects to the factual allegation that he was involved in the distribution of multi-pound quantities of methamphetamine, cocaine, and heroin beginning in July 2017. Mr. Lee acknowledges there may have been a discussion about heroin, but he was not involved in any sales of heroin.

¶22 Mr. Lee acknowledges that during this time he did use numerous vehicles with Minnesota and Arizona license plates because he was in the car business.

¶23 Once again, there were numerous vehicles registered in the name of Mr. Lee, but this was the result of his business buying and selling cars through a valid license operation in Arizona.

¶24 Mr. Lee objects to the overbroad characterizations in the first sentence, accusing Mr. Lee and Raymond Portz "frequenting financial institutions and residences of identified drug distributers as well as engaging in suspected drug transactions." The lack of any specific details makes it impossible to confirm or deny the statements, and so the sentence should be deleted. Mr. Lee does, however, acknowledge the two phone calls excerpted in this paragraph.

¶25 Mr. Lee is not aware of this particular transaction and, absent additional specifics, objects to its inclusion in the PSR.

¶29 To the extent that this paragraph implies that Mr. Lee was involved in this specific transaction, he objects and asks that it be clarified. With respect to the distribution of

methamphetamine, this was something that Portz was involved in, and Mr. Lee was not aware of the details or the specifics.

¶¶30–34 To the extent that these paragraphs imply that Mr. Lee was involved in the described transactions, he objects and asks that they be clarified.

¶37 Mr. Lee objects to the extent this paragraph attributes him with involving the minor child. Mr. Lee acknowledges that he enlisted the aid of Mr. Goodwin to facilitate the transaction, but it was Mr. Goodwin who enlisted his sister, and she decided to bring along a minor child.

¶42 Mr. Lee has no information regarding the accuracy of the factual allegations in this paragraph and objects to its inclusion in the PSR.

¶43 With respect to the allegation that there was $544,375 in unexplained cash deposited in the accounts, Mr. Lee acknowledges that there were significant cash deposits over an extended period. The majority of that money, however, was generated by the two businesses he was involved in, namely the mobile-phone business and the car business. The mobile-phone business catered to low-income people who often conducted their transactions in cash. The car business bought several cars at auctions with cash and, when the cars were sold, received cash that was deposited into the accounts.

¶44 Defendant objects to the broad characterization that all of the listed payments were used to further "drug trafficking activities." Many of these were for lawful expenses of daily life.

**Participant Summary**

¶46 Defendant objects to the characterization that Mr. Lee played an aggravating role. Defendant maintains that he was an average participant in the distribution of drugs.

4

Although the PSR has characterized this as the "Lee DTO," as previously stated, this indictment involved several individuals operating independently in the distribution of different drugs. Mr. Lee also objects to the statement that "through Donald Goodwin," he "recruited Salina Goodwin and Crystal Oquist to travel to Chicago with a minor[.]" Donald Goodwin recruited the two women, and Mr. Lee was not involved in the decision to bring the minor.

¶55 Mr. Lee reiterates his objection to any claim that he instigated, requested, or suggested bringing minor children along.

**Aggravating Role**

¶73 Mr. Lee objects to the role enhancement that he was a manager or supervisor of a criminal activity that involved five or more participants or was otherwise extensive. His primary involvement in the distribution of controlled substances was cocaine generally and methamphetamine on limited occasions, but not heroin.

In determining whether such enhancement should apply, the government bears the burden of showing by a preponderance of the evidence that defendant qualifies for a role enhancement. *See United States v. Vasquez*, 552 F.3d 734, 737 (8th Cir. 2009) (citations omitted). The guidelines direct the Court to consider numerous factors in determining whether an aggravating-role adjustment should apply, including:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, App. Note 4.

Mr. Lee has admitted his involvement in the distribution and sale of controlled substances. But rather than being the leader of some large "DTO," Mr. Lee was merely a distributor and loosely associated with many individuals in the distribution of drugs. As the PSR makes clear and as the investigation revealed, there were several individuals acting both in concert and independently. For example, co-defendant Raymond Portz, Mr. Lee's son, was involved in his own activities in the distribution of methamphetamine. While it is true that he did coordinate with Mr. Lee on occasion, Mr. Lee was not in a supervisory role over Portz. This would also apply to his association with Mr. Goodwin and other individuals named in the indictment.

In support of its claim that Mr. Lee was a supervisor/manager, the PSR and the government rely heavily on the facts and circumstances surrounding a single transaction involving a large amount of methamphetamine to be picked up in Chicago and delivered to Minneapolis. It is anticipated that the government will concede that Mr. Lee was not normally involved in the distribution of methamphetamine. And Mr. Lee does not deny his involvement in this particular transaction, as reflected in his phone conversations with co-defendant Donald Goodwin. But this is not an indication that he was acting in a supervisory role. It was simply another agreement among individuals to take advantage of an opportunity to obtain drugs.

Although acknowledging his participation in the methamphetamine transaction and the transportation of the drugs from Chicago, this is not an indication of some high-up role in a controlled substance distribution conspiracy. He worked with co-defendant Goodwin in a joint venture but not as a supervisor or manager. Although several of the

6

defendants had longstanding relationships involving the distribution of drugs, they were more inclined to act independently without supervision.

The evidence does not support the 3-level supervisory-role adjustment. The evidence shows that Mr. Lee was an average participant, and he asks the Court to calculate the advisory guideline range without this increase in offense level.

**Involving a Minor in the Offense**

¶71 Mr. Lee objects to the 2-level increase based on the assertion that he involved an individual of less than 18 years of age in the offense. U.S.S.G. § 2D1.1(b)(16)(B). If the Court should agree with Mr. Lee that no aggravating-role adjustment applies, then he cannot receive this increase. But even setting aside Mr. Lee's role in the offense, this enhancement does not apply on the facts of this case.

As a preliminary matter, the PSR as written misstates the requirements of this guideline provision, saying it applies because "the offense involved the defendant knowing that an individual less than 18 years of age was involved in the offense." This is not accurate, but the misstatement helps us to understand why the PSR erroneously concluded that this enhancement applies.

This guideline enhancement applies to defendants who receive an aggravated role enhancement where "the defendant, knowing that an individual was (i) less than 18 years of age . . . ***involved that individual in the offense***[.]" USSG § 2D1.1(b)(16)(B). In other words, the question isn't whether the offense involves a minor, it is whether the defendant was the one who involved the minor in the offense. In this context, "involve" is an active verb requiring action by the defendant.

We can begin with the plain text and the distinctions between the possible various possible definitions of "involve." The PSR uses a definition of "involve" that simply means "to have within or as part of itself: contain, include." *Webster's Third New International Dictionary* (Def. 6a.). But the guideline uses a different definition, which is not passive but instead requires action: "to draw in as a participant: engage, employ." *Id*. (Def. 2a.). So, it is not enough to merely point out that a minor was involved. Mr. Lee himself must have engaged, employed, or drawn in the minor as a participant.

That this is the proper interpretation of "involve" is reinforced by looking at the similar guideline provision in § 3B1.4, which provides a 2-level adjustment for "using a minor to commit a crime." The Eighth Circuit, like the other circuit courts, has concluded that "use" of a minor requires "some affirmative act beyond mere joint participation in a crime with a minor." *United States v. Roberts*, 958 F.3d 675, 677–78 (8th Cir. 2020) (cleaned up and citations omitted). The specific word that *Roberts* used to show the required level of action is telling: "The evidence must establish that the defendant acted affirmatively to ***involve*** a minor in the crime." *Id*.

Mr. Lee did not involve a minor child in this offense. Minors became involved because of the actions of other individuals, most notably co-defendants Donald Goodwin and Crystal Oquist. As the government told the Court in another proceeding, "[i]t was [Goodwin] who decided to recruit his family members, it was [Goodwin] who told Lee that they would be bringing kids in order to make it look good, it was [Goodwin] who served as the go-between to ensure that his sister and his cousin were doing what they were supposed to be doing." (*United States v. Donald Goodwin*, Crim. No. 19-168(6), United States' Position with Respect to Sentencing, ECF 518, at 6.) And when it came

8

time to sentence Ms. Oquist, the government claimed that her conduct in this offense fit within the larger pattern of "endangering her children" and "plac[ing] her desire for drugs above the safety of her children." (*United States v. Oquist*, Crim. No. 19-168(8), United States' Position with Respect to Sentencing, ECF 522, at 5 (requesting an upward variance for her "use of a minor").)

Mr. Lee may not have interfered with this plan, but he did nothing to encourage it. When Donald Goodwin told him about his plan, Mr. Lee responded with indifference: "I don't care how you all do it." (PSR ¶ 38.) Mr. Lee did not involve minor children in the offense, and he should not receive a two-point enhancement.

The government argues that, even if the Court should agree with the defense that Mr. Lee hasn't earned the enhancement through his own conduct, he should nonetheless receive the enhancement under the theory of relevant conduct. (*See* United States' Position with Respect to Sentencing, ECF 534, at 13–15.) But to do so would apply this enhancement too broadly. The enhancement is a creation of the Fair Sentencing Act, as part of a specific Congressional directive to the U.S. Sentencing Commission to provide (according to the section heading) "Increased Emphasis on ***Defendant's Role*** and Certain Aggravating Factors." Pub.L. 111-220, § 6 (2010) (emphasis added). The purpose of the enhancement is to provide extra punishment where "the defendant is an organizer, leader, manager, or supervisor of drug trafficking activity subject to an aggravating role enhancement," and "the offense involved 1 or more . . . super-aggravating factors[.]" *See id*. at § 6(3).

But in listing the "super-aggravating factors" that may be part of "the offense," Congress specified that ***all*** factors are actions of "the defendant." *See id*. at § 6(3)(i–v).

9

Under the new terminology, some defendants play an aggravating role in their offense, and some of those defendants play a "super-aggravating" role when they abuse their power in certain ways. Congress asked for "increased emphasis on defendant's role," and it would not serve to emphasize Mr. Lee's role by punishing him for the actions of Donald Goodwin and Ms. Oquist. No Chapter 3 role adjustment could be based on the relevant conduct of others, and Mr. Lee respectfully asks this Court to reject the government's attempt to base this Chapter 2D1.1(b)(16) role enhancement on the actions of Mr. Lee's co-defendants.

### REQUEST FOR VARIANCE

**Methamphetamine**

¶68 To the extent the guideline calculation relies on the purity of the methamphetamine seized, Mr. Lee acknowledges that the guideline calculations are correct but believes that any increase in the offense level based on the purity of the methamphetamine is arbitrary and unjust for the reasons outlined in *United States v. Ferguson*. (See Memo. Op. on Sent., 17-CR-204 (JRT/BRT) (ECF Doc. 72)). Mr. Lee respectfully asks the Court to vary downward on policy grounds to reject the guideline's increase in advisory sentencing range based on methamphetamine purity.

The purity testing in this case raised the base offense level under the U.S. Sentencing Guidelines from 34, based on the meth mixture weight, to 38, based on the meth (actual) weight. This will increase Mr. Lee's advisory sentencing range substantially, an increase that would be arbitrary and unjust, and he respectfully asks this Court to vary downward on policy grounds and use the advisory guideline range for a base offense level 34 as the starting point in choosing an appropriate sentence.

10

The meth (actual) guidelines establish sentencing ranges that are generally ten times more punitive than the meth mixture guidelines. This 10–1 ratio was not based on empirical evidence, which is supposed to drive the sentencing guideline decisions, but rather echoed statutory increases in the mandatory minimum sentences. But those statutes only established the minimums and maximums, saying nothing about what sentences are appropriate between those limitations. *See United States v. Ferguson*, Memo. Op. on Sentencing, 17-CR-204 (JRT/BRT), ECF Doc. 72 [*Ferguson* Order], at 8 (citing *Kimbrough v. United States*, 552 U.S. 85, 102–03 (2007)). Because the Sentencing Commission was not relying on its particular expertise in establishing these ranges, they are due less deference from district courts.

Moreover, methamphetamine purity is no longer a proxy for culpability or for a defendant's role in a trafficking hierarchy. The DEA reports that average purity for methamphetamine has been above 90% since at least 2011. (*See Ferguson* Order at 9 (citation omitted).) To any reasonable degree, a "methamphetamine mixture" *is* "actual methamphetamine." To punish one with a sentence ten times greater than the other is irrational and unjustifiable.

Many decisions in this district have stated policy disagreements with the methamphetamine (actual) guidelines and have either chosen to use the mixture guidelines as the proper starting point or else granted significant downward variances to lessen the effect of the unjustified methamphetamine (actual) guidelines. *See Ferguson* Order at 6–8 & n.4 (collecting cases); *United States v. Kehler,* No. CR 17-196 (DWF/DTS) (D. Minn. Aug. 22, 2018), ECF 107; *United States v. Thielen*, No. CR 17-247(2) (PAM/SER) (D. Minn. Dec. 17, 2018); *United States v. Heisler,* No. CR 18-115

11

(PJS/LIB) (D. Minn. Jan. 31, 2019); *United States v. Norwood,* No. CR 18-152 (JNE/SER) (D. Minn. Feb. 22, 2019). It is counsel's understanding that this Court has granted such a variance, *see United States v. Lockwood*, No. CR 18-280(2) (MJD/SER) (D. Minn. May 21, 2019) (applying the methamphetamine mixture base offense level despite laboratory report evidence stating that the drugs in question were "pure" or "actual" methamphetamine).

Because the guideline increase based on purity results in an arbitrary punishment, Mr. Lee respectfully asks the Court to grant Mr. Lee an initial downward variance to account for the arbitrary increase to his base offense level.

**Personal Background**

Roberto Lee was born on July 5, 1975, in St. Paul, Minnesota, and he has lived in the Twin Cities his entire life. He never met his biological father who died shortly after he was born but was raised by his mother and step-father. His mother now resides in Hastings, Minnesota, where she is on Social Security disability. By all accounts, she was a good mom and a hard worker.

The same cannot be said of his stepfather. With his violent nature and physical and verbal abuse, he terrified Mr. Lee. Mr. Lee rebelled against his stepfather, and by age thirteen, he had acted out and ended up in various juvenile detention centers in St. Paul. It wasn't until Mr. Lee was about fourteen that he was finally able to defend his mother and himself with what he learned participating in Golden Gloves Boxing. His mother has confirmed this traumatic upbringing. Suffice to say, his upbringing was not ideal and has obviously contributed to the decisions he has made in life. Often, Mr. Lee would stay away from the home to avoid contact with the turbulent situation. During that time, Mr.

Lee came into contact with drugs and eventually became involved in distribution to generate income. This continued throughout most of his adolescence and young adult life.

As the Court is aware, this is not Mr. Lee's first contact with the law as a result of drug activity. He has a prior conviction in Hennepin County in 2006 and an additional conviction in federal court in 2010. As a result of that federal conviction, he was sentenced to 70 months in prison, which he satisfactorily completed. While incarcerated, he took advantage of available programming, obtaining his GED and participating in multiple educational classes including entrepreneurship 101, career preparation, banking and budgeting, and classes addressing purchasing a home. Mr. Lee took advantage of these opportunities because on re-entry he wanted and planned to become his own businessman in something other than the sale and distribution of drugs.

Upon his release, he immediately began to use those skills and start his own businesses. Unfortunately, despite several efforts, they were not successful. First, he started a mobile-phone business, but it was not profitable and had to close. At the same time, he invested in a tattoo shop with another individual by paying rent for the building. Unfortunately, that did not work out either. His most successful business effort was a jointly owned remodeling business, "Inside Out Remodeling." He worked hard at this business, and it was doing well and he was able to hire employees. The business did not start to have financial difficulties until contractors failed to pay him for work that had already been completed. He went into debt so he could continue to pay his employees for their work. Ultimately, that business too failed. In short, despite repeated efforts at starting and managing his own legitimate businesses, he was not successful.

As a result of his failed business activities, Mr. Lee made the wrong decision to get back into the drug business, and he now finds himself before the Court. As he said himself in his statement of responsibility:

> First off, I know that what I did was wrong, unacceptable and illegal. I should have known better given my past experience and when I was released from prison the last time, I did my best to try to start my own business and move forward. Initially, I was successful but then ultimately due to non-payment by some of my contractors, I was not able to keep them afloat. It was then that I went back to my old ways and got back in the drug business. As I said earlier, I should have known better and I accept full responsibility for my actions and even though I am anticipating a lengthy prison sentence, I intend to use that time to be productive. Nonetheless, I am prepared to accept my punishment and move forward in my life and hopefully a new beginning after my sentence. I would appreciate any consideration the Court can provide to assist me in that goal.

Mr. Lee knows that he is facing a lengthy prison sentence, but nonetheless he has continued to attempt to move forward with his life even while incarcerated at the Sherburne County Jail. Rather than just sit around and wait for something to happen, he has made himself a useful component in the day-to-day operation at the jail. This is confirmed by Captain Zerwas that during his lengthy period of pretrial detention at the Sherburne County Jail, Mr. Lee volunteered and was accepted into the Inmate Voluntary Work Program (See letter dated July 22, 2020 from Captain Zerwas as Exhibit A). He performed numerous work duties throughout the facility including necessary activities related to the Covid-19 pandemic. He has shown the ability to take initiative and make the most of his time while there. Although this letter was sent back in July, his positive performance is ongoing and has continued to the present.

As an additional consideration for the Court, Mr. Lee's lengthy incarceration at the Sherburne County Jail Facility constitutes hard time and justifies a departure from the

14

guidelines. As this Court is well aware, situations at the jail are far from ideal. There is no personal contact with family, there are limited programming opportunities, and the entire situation has been compounded by the pandemic. Despite these limitations, Mr. Lee has performed admirably while incarcerated and has made the most of his time and assisted at the facility. Accordingly, he is requesting that his incarceration during pretrial detention be considered hard time and that he be given a two-day for one-day jail credit.

Mr. Lee is a good man who has done a bad thing again. His goodness is confirmed by the letters of support from friends and family and the badness is confirmed by his involvement in criminal drug activity. He should have known better, and he recognizes that. He has broken the law and is prepared to accept responsibility for his actions. Applying the §3553 factors, defendant maintains that a sentence of 180 months is more than adequate and reflects the seriousness of the crime, consideration for his own unique circumstances, promotes public safety, and serves as an adequate deterrent. For all of these reasons, Mr. Lee is respectfully requesting a variance from the advisory guideline range pursuant to 18 U.S.C. §3553 and a sentence of 180 months.

Dated:  December 8, 2020              Respectfully submitted,

**LAW OFFICES OF
THOMAS H. SHIAH, LTD.**

By     S/Thomas H. Shiah_____
       Thomas H. Shiah #100365
       331 Second Ave South, Ste 705
       Minneapolis, MN 55401
       (612) 338-0066

       Attorney for Defendant

15

Exhibit A

7/22/20

To Whom It May Concern:

Inmate Lee, Roberto (SPN #22068) has been an Inmate housed at the Sherburne County Jail as a USM Boarder since June 27th, 2019. On October 7th, 2019 Inmate Lee volunteered, and was accepted into, the Inmate Voluntary Work Program as an Inmate Worker. As an Inmate Worker, Inmate Lee has performed numerous work duties throughout the facility such as assisting staff with laundry exchange, operating washers and dryers in the laundry area, delivering/collecting meal tray carts and completing housekeeping duties as assigned throughout the entire facility. With the current COVID-19 pandemic going on in our world, Inmate Lee has been very helpful with staying on top of cleaning around the facility to include sanitizing touch points, assisting with laundry exchange and safely laundering clothing from all the inmates in our quarantine unit and our entire facility.

Inmate Lee has shown the ability to take initiative and learn new things and adjust to his environment and make the most of his time here. Feedback from staff has been very positive.

Sincerely,

Captain Tom Zerwas

Sherburne County Jail

Elk River, MN